Good morning. Thank you, Your Honor. May it please the Court, again, Conor Cantrell on behalf of Hartford. I typically refer to the credit union as the bank, if that's okay. I may refer to them as CCU, but just so we're all on the same page in terms of parlance. I'm going to try to reserve around five minutes. I understand if we're talking, I may go under or over slightly, but with that, I'd like to proceed. I want to try to do two things. I want to try to give some clarity or some context to what it is that we're doing here, and then also I want to raise something that kind of occurred to me as we were preparing. I think we may be slightly putting the cart before the horse here in terms of the merits of this dispute. Because under 362, the automatic stay of rules, those are summary proceedings. If you look at, for example, N. Ray Montgomery, 262B Bankruptcy Reporter 772, that's an Eighth Circuit BAP case from 2001. That case and several others like it say that the trial court in the stay context isn't supposed to decide the merits of the dispute. It's not just supposed to decide parties' conflicting rights. They're supposed to say, yes, you have relief from the automatic stay such that you can go litigate those rights. And so I think what happened here is the bankruptcy court, the trial court, got a little ahead of itself in deciding the merits of the dispute, and she really decided who had priority and who wins the competing contract claim between Capital Credit Union and my client Hartford. And that, I think, is error because that's... Yes? I'm sorry, counsel. Yeah. But you didn't object in the moment, correct? You didn't say, wait a minute, judge, you're asking for evidence and this is a summary proceeding and you can't reach that determination. You all proceeded as though she was going to make a decision vis-a-vis the priority in the money, correct? So, yes and no. In the briefs, we did object. We said, hey, we think there's a dispute here that needs to be resolved as to whether there are bonded contract funds in the account. We think there's a dispute over priority and we think that that dispute should be decided. So I wouldn't have objected to lift the stay to allow that dispute to go forward. So we did object at the briefing. And then at the hearing, Your Honor, I didn't really have an opportunity to object because the way it shook out, the trial judges started asking questions, I was answering questions, and it didn't come up naturally in the context of the oral arguments. I will also note for, as a practical matter, if it goes back down, now there is an adversary proceeding being decided by the same judge. So I'm not sure that, you know, it really matters. But I do think, as a matter of technicality, I do think she got ahead of herself in terms of deciding the merits in what should have been a summary proceeding. Are you saying the same issues that are before us are now in an adversary proceeding in Mayne case? Yes. So they weren't at the time of the brief and the oral arguments. And then there's a larger dispute, Judge Jones, on who's entitled to various contract funds. So there's the Air Force, there's my client, there's the credit union. I don't think that there are any other competing creditors in that adversary. It's adversary proceeding 25-07-001. It was filed after, I think it was filed after the briefing was complete and maybe even after the trial court's ruling. It was filed in January of this year. Right. How, has the issue been raised in that case about jurisdiction given this appeal? Not to my knowledge. Thank you. And is this appeal moot effectively? Is that what you're saying? I don't think that the appeal itself is moot, Your Honor, but I do think that that argument could be raised. I mean, I think not moot in the sense of did she err in granting relief from stay? No. I wouldn't, I wouldn't, I would withdraw any objection to her granting the relief from stay. But my objection is to the extent we're arguing the merits, she got the merits wrong. And that's where I want to talk about the merits because to the extent you do have jurisdiction and it's not moot, I don't want to sit up here and talk about... Well, we have a duty to raise it. Right. I know this because it's jurisdictional. And so I just want to make sure I understand. So are you saying effectively the parties have acted as though the order lifting the stay never took effect and have effectively agreed to litigate the same things before the bankruptcy court? I think the parties have agreed that the stay was lifted so that they were able to participate in the adversary proceeding. And then, yes, I do think that the parties are litigating those issues below. I mean, if you look at the pleadings, that's, it's all about priority. Is the trustee climbing an interest in these funds in the IP? Not in these particular funds. Okay. So it's still non-debtor parties that are litigating this? As it relates to the funds that were in the deposit accounts, yes. Let me help you out on this. I believe the trustee was a party, as was the governmental entity, but they are not actively participating now. I don't recall if it was a settlement agreement or whatever. But that's why I raised the question. We're getting a little sideways here. But how is the adversary? What's the jurisdiction in the adversary proceeding? Not with respect to this appeal. But let's move on. Okay. Thank you. So giving some context to the dispute between banks and sureties in general. Banks and sureties are constantly fighting over contract funds. And that's because banks lend money to contractors who need funds to operate. Contractors need surety bonds on public works because the Miller Act requires surety bonds. And in many cases, private jobs also require surety bonds. And so the law has developed. There's Perlman, which is a seminal surety decision. And the law has developed. And usually the dispute is over earned but unpaid contract funds. Didn't you concede below that Perlman is no longer one of the three grounds you're relying on? Yes. To say your client has priority.  So I'm just giving like a, I'm just, I'm going to get to where I'm, where I'm. Well, we've all read the record. No, I know. So the context, what I'm saying is the context is Perlman gives you the right, the surety's the right to earn but unpaid contract funds. And the inter-creditor agreement that we entered into with the credit union is the logical follow-on to the surety's Perlman rights. And what I mean by that is if we didn't have the inter-creditor agreement, and if you look at the authority cited by the trial judge, International Fidelity, Berkeley, NRA Binder, those are the cases that the trial court said that she relied on. Those cases all basically say that once contract funds are earned and paid, the surety loses its equitable subrogation rights under Perlman. And that's why we concede that equitable subrogation doesn't apply here. And where I think the trial court erred on the merits is she then disregarded the language of the inter-creditor agreement where, go ahead. So, well, if I go back to the general indemnity agreement, what do you think the effect of the debtor assigning all of its rights to Hartford was in that general indemnity agreement? At one point, we talk about needing a security interest, and the court did an evaluation using the UCC, so I'd like to know your thoughts on that. Was that an error to do that? At one point, you call your interest a security interest, and then in the brief, you call it a lien. So, which is it? I mean. Sure. So, the way I've been referring to it, Your Honor, is a capital L lien as defined in the inter-creditor agreement, right? And I think where the trial court erred on that point is she was viewing the inter-creditor agreement and its contractual terms between CCU and Hartford under the lens of the UCC, where the inter-creditor agreement itself says it's governed by North Dakota law, and North Dakota specifically contract law would apply. I mean, if we're interpreting a contract between Hartford and CCU, that contract is governed by contract law, not UCC law. And so, when the trial court says, well, your contract doesn't grant you a UCC-type security interest in proceeds, I think that was error, Your Honor, because it's not governed by the UCC, nor would it. In that mischaracterizing the bankruptcy court's ruling, though, didn't she start with the general indemnity agreement and said, there's nothing in the assignment clause, the four subsections of the assignment clause, that gave your client any rights. So, we don't even really need to get to what's the effect of the inter-creditor agreement. So, same answer. I think the trial court was viewing the general indemnity agreement under the lens of a UCC analysis, when she should have been interpreting the contract, which, again, was a contract between the debtor and Hartford, right? And, again, I go back to the context of the surety bonds, and I know I'm a little bit over, but I'm going to keep going. In the context of surety bonds, and a creditor like the bank, when the inter-creditor agreement starts, there would be no reason for the surety to have a UCC interest, because the assignment provision and the security interest are all triggered by a default, which means getting fired on a job. So, the sureties don't, as a matter of practice, record their UCCs until there's a default, because the security interests aren't triggered until there's a default. By that time, we're always behind the bank. Wasn't there a stipulation, though, that your client didn't declare a default? My clients don't have to declare a default. It's the obligees on the jobs declare the default, but at the time the petition was filed, there hadn't been a default, I think, was the effect of the stipulation. So, my point is that we can't look at this under the lens of the UCC. We have to look at it as a matter of contract interpretation, because the UCC context makes no sense when the parties are entering into their agreement. The banks are always ahead of the sureties in filing the UCCs, because the banks record their UCCs, because they always have an interest as soon as they loan the money. The sureties' security interests don't trigger until there's a default. And so, that's why I think the trial court erred when it was defining capital L liens in the context of the UCC, when she should have given effect to the plain language of the indemnity agreement, going back to your question. The plain language of the indemnity agreement, it says any and all rights. And so, that would include proceeds. It must. If it didn't, what, then it doesn't say any and all. It says any and all except proceeds. I'd like to reserve the rest of my time. Thank you. Thank you. Mr. Pushkin. Good morning. May it please the court, opposing counsel. I'm Attorney Drew Hushka, and I'm representing Appellee Capital Credit Union, or CCU in this matter. In December of 2021, CCU loaned debtor Promark Services $15.75 million over two loans. As collateral for those loans, CCU took a security interest in certain personal property, including deposit accounts. We're familiar with all that, but could you address the, basically, the core threshold jurisdictional issue opposing counsel raised? Is this effectively moot? I don't believe so, Your Honor. There has been an adversary action that was commenced, as Judge Constantine referenced, in January of this year. That began as related to property not subject to the Relief from Stay motion. It was related to these other payments for other projects that had not been paid, retainage payments that the United States government so had. Hartford did counterclaim seeking or serving a claim related to breach of contract between the intercreditor agreement between CCU and Hartford as one of their counterclaims, but I don't believe it moots this issue for whether or not Relief from Stay should have been granted to offset the funds. Aren't the legal issues the same, just a difference in collateral? The legal issues are related, but I don't believe that they're the same, because as we reference, and I believe as Judge Hastings found, that the legal issues raised in retainage funds, funds that haven't been played, are generally subject to equitable subrogation. As you referenced, Judge Norton, we were a bit confused on the 28J letter because equitable subrogation had been waived at the bankruptcy court level, and so we weren't sure if it was being argued here. I don't believe that that is the primary issue in this adversary action, which I believe had been abandoned at the trial court level, at the prior level in this case. I believe they're related, but they are separate because they are different legal issues for retainage funds versus funds that had been paid, were received by the debtor, were deposited with CCU, and are not subject to equitable subrogation at that point. Thank you for that clarification. In the oral ruling, the bankruptcy court said that it looked at the intercreditor agreement, and she said, I think the agreement in and of itself, when read as a whole, would suggest that if Hartford can demonstrate that the money deposited into the account is proceeds of the bonding contracts, that it can show those proceeds are, in fact, surety, priority, collateral, and then its claim would be superior to CCU. I think one of the arguments was that once the money was deposited in the deposit account, then the bank had a security interest. But if that's true, why do you even need the intercreditor agreement? Why did you, what was the intent of that? I think the intercreditor agreement was a, and obviously this isn't on the record, but my understanding is the intercreditor agreement was a tool between Hartford and CCU to set priorities, as my friend on the other side alluded to. CCU did have a prior-in-time perfected UCC priority over essentially all of these assets. And so what the intercreditor agreement did was it simply allowed, or simply, CCU agreed to subordinate its interest in its perfected collateral to that under Hartford's, in the event that Hartford was able to establish that the property at issue is surety, priority, collateral, as defined by the intercreditor agreement, and that it possessed a lien, as defined by the intercreditor agreement, in that surety, priority, collateral. So the question is essentially a two-step process. Is this property surety, priority, collateral? And is there a lien in that surety, priority, collateral? If both of those questions are true, then under the intercreditor agreement, we concede that capital credit union agreed to subordinate its interest in its perfected collateral to those of Hartford. But on our, I respectfully submit that Hartford failed to establish that the property, the funds at issue were surety, priority, collateral, in which it held a lien. To your point, Judge Jones, regarding the payments under bonded contracts, we would concede that under the definition of surety, priority, collateral, the proceeds from bonded contracts are defined as surety, priority, collateral. But there still is the related question of whether or not Hartford possessed a lien in those surety, priority, collaterals. And that is what Judge Hastings determined they did not because the GIA did not give them an operative lien as defined by the intercreditor agreement in those bonded contract proceeds. Doesn't it say something even better than granting a lien? Doesn't it say all rights, all rights arising from, et cetera, et cetera, et cetera, are being assigned? It says all rights arising from or related to the bonded contracts. And what Judge Hastings determined, and we agree and respectfully argue was correct, was that proceeds are not rights related to the bonded contracts. They are a step removed. Accounts receivable, which would have been assigned, would be rights related to the bonded contracts. But proceeds after they transform from accounts receivable into proceeds, into cash, into deposit accounts are something different. They're a step removed. I'm sorry, but are you saying that the broad assignment language in the GIA is an assignment for collateral for security purposes and not a true assignment? Is that what you're saying? We believe that it wasn't a true assignment and that even if it was a true assignment, that it does not encompass proceeds because they're not within the definition that Hartford decided to write in their GIA agreement. Wouldn't that get back to the argument that your co-counsel raised under the Montgomery case, that this was a summary proceeding and there would have needed to have been evidence on that and there really wasn't? There was a full evidentiary contested hearing. The parties did submit stipulated facts beforehand. Both parties had the opportunity to submit any evidence they wanted that they believed was relevant to this case. Relevant to the lifting of the stay, but I didn't see anything in the motion or the objections that said we're agreeing, we're going to litigate in the context of a motion for relief, the priority dispute between these two creditors. But they did, Your Honor, quite by practicality if nothing else. That that was the issue raised and their objection is that you cannot lift the stay here because we have priority to this under the GIA and the intercreditor agreement. So are you saying that Hartford has waived the right to raise a Montgomery type of issue on appeal? Yes, Your Honor. They were the ones that raised this issue below that asked for the bankruptcy court to adjudicate priority by lifting that. And as the court is aware that the precedent is that it's our burden, CCU's burden to first establish a prima facie showing for a set off, which we did, which the bankruptcy court found and which my friend on the other side did not object to at the lower court at all. With apologies to my co-panelists, because I know they have other questions, but I just want to finish this thought in my mind while I have it. So has race judicata or claim preclusion or issue preclusion been raised below by your client in any of the claims that Hartford has asserted?  As the court knows, there is that adversary action that is raised. We did not raise race judicata, collateral estoppel, judicial estoppel, any of those equitable defenses in it. Because as we kind of allude to in our mootness argument or asking for an advisory ruling argument, we don't believe that the determination on whether to lift the stay is a final ruling on the merits that would be subject to race judicata or anything else in the adversary action. So can the court probably look at this from a practical standpoint? And is Judge Hastings likely to change her mind and totally apply different law? Unlikely, but at the same time, we don't believe that her determination in allowing and granting the motion and lifting the stay is entitled to race judicata effect in that adversary action. I don't know if that addresses the court's question or not. So would you agree that there is cause to grant relief from stay? Certainly. But do I hear you saying that you don't necessarily believe that the ruling on the set-off issue is really a ruling on that? It's just like capital credit union doesn't, I mean, does it think that it needs to go now and pursue that in another court with Hartford instead of going and setting off the accounts? How we interpreted the ruling below as it relates to the lift stay is that we were granted relief to lift the stay and we could set off those funds. But to the extent that Hartford wants to bring their breach of contract claim against CCU to allege that we are somehow breaching the intercreditor agreement by setting off these funds as opposed to paying them over to them, obviously, we have not raised race judicata and we do not believe that's stopped. Does that answer your question? But to say that you can go to set off the accounts, isn't that contradicting that this is a summary proceeding and that wasn't a decision on the merits? It was the relief requested and that was not separately objected to and it was within the scope of what was determined by the parties and was proper and was before Judge Hastings without objection. Well, while we're on this topic, I did want to focus less on the merits at this time and focus on the procedure and the appellant has clearly argued that the bankruptcy court should have only determined that your client had a colorable claim and that the bankruptcy court's decision on the merits or the rights of Hartford and Capital, capital vis-a-vis each other, was unnecessary and inappropriate. That was their argument and it sounds like you're agreeing with them at this point, is that right? No, Your Honor. I'm sorry if it's coming across that way. That is not my argument. My argument is, is that they raised the issue of seeking the priority determination by Judge Hastings. It seems disingenuous for me or from them to say, Your Honor, you cannot allow the setoff because we have priority over this and then when the bankruptcy court actually looks at that priority and makes a determination based on the facts that they choose to submit when they had the opportunity to submit any and all facts and made a preliminary determination that we had a superior interest in these funds to then come and say, well, the court erred by coming in and making that determination that we asked it to make. Because if you look at the record, it's very clear that before the evidentiary hearing, before that ruling was made, they did not say, Your Honor, you cannot look at the priority between these parties. It was only after that fact, after they lost, after they raised that issue and they received an adverse ruling, that to this court, they're arguing that that was an error for there to be some determination of the priority between the  Did the parties consent to the bankruptcy court entering a judgment on a non-debtor issue, on a contract issue? I believe so, Your Honor, by action, if nothing else. So it's an implied, you think it's implied consent? Yes, Your Honor. I see my time is starting to wind down a little bit. I do want to briefly break out some of these funds that are at issue. Obviously, most of the arguments that we've talked about have been related to proceeds from bonded contracts. There is a separate pool of money in these deposit accounts that were sought to be set off as well, and that's the $1.9 million that was stemming from the settlement of a failure to defend officer and director liability claim. My friend on the other side is arguing that this is somehow surety priority collateral in which they held a lien as well. It is not under the definition of surety priority collateral. It does include bonded intangibles, but bonded intangibles include insurance payments related to payoffs for damage or destruction of other surety priority collateral. The failure to defend an officer or director is not a bonded intangible under that definition, and so even if they somehow had a lien by virtue of the GIA or the ICA in insurance proceed payments, these specific insurance proceed payments were not a bonded intangible and therefore were not surety priority collateral. Going back to your motion for relief, though, I didn't see any request in your motion or in the objection or the supplemental briefing or the stipulation of facts as to this specific issue. I know it came up during the hearing. Wouldn't it have needed to be procedurally teed up to present evidence so that the judge could determine it? You're saying the judge determined it. Determined. We're not. Judge Hastings didn't determine it. What we're saying is we properly raised this below and that this Court can affirm on any grounds that were raised by a party below if the record is clear. The stipulation between the parties is quite clear that this $1.9 million relates to this payment and it's just a matter of contractual interpretation then for whether or not this meets the definition of a bonded intangible. So you're saying affirm the lifting of the stay, allow the adversary to go forward. In effect, are you saying that Hartford is correct when nothing in judge, in the bankruptcy court's ruling in the context of the lifting of the stay is res judicata as to what happens in the adversary and who gets the money eventually? I don't think Hartford is correct on any of the claims. Like I said, we want to put that out there. But I do believe that they can raise those claims and we can argue about that in the district or in the bankruptcy court in the adversary action that the lift stay determination is not going to be entitled to res judicata. You're conceding it's not res judicata. The second argument that they've raised. I'm conceding that it's not res judicata, but I also think that this is inappropriate for this court to determine that. That would be, again, an issue that wasn't raised at the bankruptcy court level for whether or not the order had res judicata effect and it's essentially we have not asserted res judicata. It's a preemptive ruling saying that in the event they try to raise res judicata in this collateral proceeding, they cannot do so. I believe that is pretty much a textbook advisory opinion and would not be appropriate for this court to render, especially with my concessions here. I believe that if nothing else, they could waive the transcript and try to argue that we can't raise res judicata at this point, which again, we're not doing. Unless there are any other particular questions, I believe that did address the majority of my points. Other than the $1.9 million on the E&R, O&E, whatever that was, the omissions, you don't dispute that some of the proceeds, some of the money in your deposit accounts are directly related to some of these contracts, right? Beyond the $1.9 million, we would concede that the remaining funds are proceeds from bonded contracts, but that proceeds are beyond that. We do contend and we did brief that some of those proceeds did become ordinary course payments when they were transferred between the parties and that the party's definition of ordinary course payment should triumph over the bankruptcy code's definition of ordinary course payment, which is irrelevant to the proceeding before the court. Thank you. Thank you. Mr. Cantrell, I believe you have a few more minutes. Thank you. First, as to whether Hartford waived its arguments about this being a summary proceeding, I would refer the panel to our response, paragraph 15, paragraph 33, paragraph 25, and those are the ones that I was able to pull as I was feverishly searching, but there in all of those paragraphs, Hartford objected to lifting the stay because there had been what we called an orderly disposition of the deposit accounts, so I respectfully disagree with my colleague when he says that there was a waiver. We did raise it in our objection. Now, did it come up at oral arguments? No, but as I'm sure the panel is aware, lots of things don't come up at oral arguments. You only have a limited amount of time. Are you really saying that it was okay for the bankruptcy court to lift the stay and you just want to preserve the rights you have in the adversary that we've now learned is going forward on related issues? Is that what you're really saying? Well, I'm saying two things. I'm saying, yes, I think it was okay. It was definitely okay for her to lift the stay to allow the parties to litigate this issue. I also think that in lifting the stay, she went too far, both in deciding the merits and then deciding them incorrectly. The second point I want to raise is that Mr. Hushka referenced this $1.9 million, which were defined as bonded intangibles, and then he also referenced ordinary course payments. I think if you look at the record, there were no factual findings whatsoever as to those two parts of the deposit accounts. And so I don't think that the panel can affirm on that with no factual findings whatsoever below. Finally, Mr. Hushka said that, and this is the last point and a big one that I want to raise, is he said the intercreditor agreement is a tool to set priorities. And he's right, and we agree. And he said if Hartford can demonstrate that there was surety priority collateral, which he conceded there was, and if Hartford can establish that they possess a capital L lien in the intercreditor agreement, which we can, then we win. And so I would encourage the panel to think about the impact that this has on surety and indemnity agreements, which are used broadly across all construction projects across the country, and every single one of them says any and all. And a ruling that says any and all means any and all but proceeds is a very dangerous precedent. Thank you. Thank you, Mr. Cantrell.